UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                                                                Case No: 6:25-cr-219-1-JSS-DCI

JAMES LINNARD TAYLOR,

     Defendant.
_____/

## **ORDER**

Defendant, James Linnard Taylor, moves to suppress the admission of evidence obtained by officers and the statements that he made following his arrest on June 23, 2024. (Dkt. 47.) The government opposes the motion. (Dkt. 54.) On June 4, 2026, the court held an evidentiary hearing and heard oral argument on the motion. (Dkt. 59.) For the reasons outlined below, the court grants the motion in part.

## **BACKGROUND**

On June 23, 2024, Orlando Police Department Officers Michael Klimkiewicz and Kyle Shaouni were patrolling west Orlando in an unmarked vehicle. (*See* Hr'g Tr. at 5–6, 12, 33, 68.) Just after 11:00 PM, the officers were driving eastbound on John Young Parkway when they observed Defendant operating a white Cadillac without headlights. (*See id.* at 63, 69.) Officers Klimkiewicz and Shaouni both testified that they could clearly see Defendant. (*See id.*) The officers then watched as Defendant entered a 7-Eleven parking lot and parked the Cadillac in a handicap parking space

without displaying a disabled parking permit.  (*See id.* at 5–6, 9, 11, 69; *see also* Gov't Ex. 1; Gov't Ex. 2.)

Evidence provided during the hearing on Defendant's motion to suppress shows the Cadillac traversing the 7-Eleven parking lot.  (*See* Gov't Ex. 1; Gov't Ex. 2.) Despite the darkness, the Cadillac's headlights are unilluminated; only the daytime running lights are on.  (*See* Gov't Ex. 1; Gov't Ex. 2.)  Initially, the Cadillac backed into a parking space just outside the 7-Eleven's security camera's view.  (*See* Gov't Ex. 2 at 2:09.)  But moments later, the Cadillac reentered the frame, as it pulled forward and reversed into the adjacent handicapped parking space.  (*See id.* at 2:30–2:55.) Throughout the video, the Cadillac's headlights remain unilluminated.  (*See id. passim.*) Having observed these traffic violations, Officers Klimkiewicz and Shaouni attempted to initiate an investigative stop.  (*See* Hr'g Tr. at 5, 12, 36–37, 69.)

Before the officers could initiate the stop, they observed Defendant exit the Cadillac.  (*See id.* at 9, 69.)  Indeed, at 11:18:02, the 7-Eleven's security camera shows a figure, dressed in white, exiting the vehicle.  (*See* Gov't Ex. 2 at 3:00.)  At 11:18:04, the footage from Officer Klimkiewicz's body-worn camera shows Defendant, dressed in white, stepping away from the vehicle.  (*See* Gov't Ex. 4 at 0:56–1:00.)  A dark-colored satchel is strapped to Defendant's chest.  (*See id.*)

The footage from Officer Klimkiewicz and Shaouni's body-worn cameras shows Officer Klimkiewicz attempting to stop Defendant before he enters the 7-Eleven.  (*See id.* at 0:58–1:00; Gov't Ex. 9 at 0:41–0:43.)  Gesturing to the Cadillac,

Officer Klimkiewicz informs Defendant that he is unlawfully parked. (*See* Gov't Ex. 4 at 0:58–1:00; Gov't Ex. 9 at 0:40–0:44.) As Officer Klimkiewicz attempts to stop Defendant, Officer Shaouni's body-worn camera shows Defendant, who has not yet entered the 7-Eleven, look directly at Officer Klimkiewicz. (Gov't Ex. 9 at 0:41–0:42.) Defendant either does not hear or ignores Officer Klimkiewicz, because he proceeds to enter the store. (*See* Gov't Ex. 4 at 1:00; Gov't Ex. 9 at 0:42.) Accordingly, Officers Klimkiewicz and Shaouni follow Defendant inside. (*See* Gov't Ex. 4 at 1:00–1:09; Gov't Ex. 7 at 3:15–3:50; Gov't Ex. 9 at 0:44–0:51.)

Upon entering the 7-Eleven, Officer Klimkiewicz gained Defendant's attention. (*See* Gov't Ex. 4 at 1:00–1:09; Gov't Ex. 7 at 3:21.) Officer Klimkiewicz again informed Defendant that he is unlawfully parked in a handicapped parking space and asked that Defendant accompany the officers outside to address the matter. (*See* Gov't Ex. 4 at 1:07–1:21.) According to Officers Klimkiewicz and Shaouni, Defendant was not free to leave at this point. (*See* Hr'g Tr. at 43, 80.) As Defendant accompanied the officers outside, he asked Officer Klimkiewicz to restate the reason for the stop. (*See* Gov't Ex. 4 at 1:18–1:36; Gov't Ex. 9 at 1:05–1:16.) In response, Officer Klimkiewicz reiterated that he and Officer Shaouni initiated the stop upon observing Defendant operating the Cadillac with unilluminated headlights before unlawfully parking in a handicapped parking space. (*See* Gov't Ex. 4 at 1:18–1:36; Gov't Ex. 9 at 1:05–1:16.) All told, approximately forty seconds passed from the moment Officers Klimkiewicz and Shaouni first encountered Defendant until they stepped outside. (*See* Gov't Ex. 9 at 0:40–1:20; *see also* Gov't Ex. 7 at 3:18–3:51.)

- 3 -

Upon exiting the 7-Eleven, Defendant tried to run.  (*See* Gov't Ex. 4 at 1:38–1:45; Gov't Ex. 9 at 1:18–1:24; *see also* Hr'g Tr. at 14, 47, 70.)  He stumbled, allowing Officers Klimkiewicz and Shaouni to take him to the ground.  (*See* Gov't Ex. 4 at 1:38–1:47; Gov't Ex. 9 at 1:18–1:28; *see also* Hr'g Tr. at 14, 47, 70–72, 80.)  A struggle ensued, during which Officer Klimkiewicz testified that Defendant elbowed him in the head, causing him to bruise.  (*See* Gov't Ex. 4 at 1:47–3:11; Gov't Ex. 9 at 1:25–2:25; *see also* Hr'g Tr. at 14–15, 49.)

Officer Klimkiewicz further testified that, during the struggle, Defendant threw his satchel into the parking lot.  (*See* Hr'g Tr. at 16–18, 48–49; *see also* Gov't Ex. 4 at 1:48–3:11.)  A detailed review of the footage from Officer Klimkiewicz's body-worn camera shows that to be the case.  (*See* Gov't Ex. 4 at 1:48–3:11.)[1]  Once Officers Klimkiewicz and Shaouni take Defendant to the ground, Defendant's left hand clasps the satchel.  (*See id.* at 1:48–1:49.)  Defendant then rose to his knees, creating separation between himself and the ground.  (*See id.* at 1:51.)  Using the space that he created, Defendant extends his left arm forward—the satchel clearly in his hand— before swinging his arm backward.  (*See id.* at 1:51–1:52.)  As Defendant does so, Officer Klimkiewicz's right hand is on Defendant's back, and his left hand is reaching for Defendant's left shoulder; there is clear separation between the satchel and Officer Klimkiewicz's hand.  (*See id.* at 1:51–1:53.)  Then, just before Officer Klimkiewicz's

---

[1] When viewed in real time, the events captured by Officers Klimkiewicz and Shaouni's body-worn cameras are difficult to decipher.  The relevant events become clear when the footage from Officer Klimkiewicz's body-worn camera is slowed to quarter speed (0.25).

body-worn camera is knocked loose, Defendant's arm swings forward, launching the satchel into the parking lot. (*See id.* at 1:51–1:54; *see also* Hr'g Tr. at 14–16, 48–49, 81.) Shortly thereafter, the officers manage to subdue and handcuff Defendant, at which point Officer Shaouni retrieved the satchel from the corner of an adjacent parking spot. (Gov't Ex. 9 at 2:25–3:13; *see also* Hr'g Tr. at 16, 72–73.)

Defendant was arrested for resisting without violence and battery on law enforcement. (*See* Gov't Ex. 4 at 2:05–3:13; *see* Hr'g Tr. at 15.) Thereafter, Officers Klimkiewicz and Shaouni searched Defendant and found the keys to the Cadillac. (*See* Gov't Ex. 4 at 3:20–6:39; Gov't Ex. 9 at 2:45–6:30; *see also* Hr'g Tr. at 102–03.) Officers Klimkiewicz and Shaouni placed Defendant in the back of another officer's patrol car. (*See* Gov't Ex. 4 at 6:40–7:05; Gov't Ex. 9 at 6:30–6:30.) At this point, approximately six minutes have passed since Officers Klimkiewicz and Shaouni first encountered Defendant. (*See* Gov't Ex. 4; Gov't Ex. 9.)

Upon securing Defendant in the back of a patrol car, Officer Shaouni performed a warrantless search of Defendant's satchel. (*See* Gov't Ex. 9 at 6:49–7:47; *see also* Hr'g Tr. at 51, 83.) Therein, Officer Shaouni discovered a loaded firearm. (*See* Gov't Ex. 9 at 7:20–7:47.)

Around this time, Officer Dominik Kosmaty—who responded to Officers Klimkiewicz and Shaouni's call for backup—testified that he used a handheld flashlight to observe the interior of the Cadillac. (*See* Hr'g Tr. at 94–96.) As he looked inside the vehicle, Officer Kosmaty stated that he could see a small amount of

marijuana[2] on the passenger floorboard. (*Id.* at 96.) He could also smell burnt marijuana emanating from inside the vehicle. (*Id.*) Officer Kosmaty relayed these observations to Officer Klimkiewicz, who also testified that he could see marijuana shake on the passenger floorboard. (*See id.* at 21–22, 52, 96–97.) Based on these observations, the officers searched the vehicle. (*See id.* at 21–22, 96–97.) Like the satchel, the officers searched the Cadillac without obtaining a warrant. (*See id.* at 51, 83.)

During the search, Officer Klimkiewicz tested some of the marijuana from the passenger floorboard with a marijuana field narcotics identification kit (NIK). (*See* Gov't Ex. 8 at 0:54–5:02.) At the hearing, Officer Klimkiewicz testified that the NIK testing returned presumptive positive for marijuana. (*See also* Hr'g Tr. at 22–23, 52.)

Having observed marijuana on the passenger floorboard, Officer Kosmaty searched the rest of the vehicle, including the trunk, where he found a briefcase alongside a duffel bag. (*See* Gov't Ex. 8 at 2:18–2:41; *see also* Hr'g Tr. at 24, 56, 97.) Although Officer Kosmaty initially believed the briefcase was locked, he later determined it was merely latched shut and could thus be opened. (*See* Hr'g Tr. at 24, 56, 97, 107; *see also* Gov't Ex. 8 at 2:21–2:41; Gov't Ex. 10 at 2:30–2:45, 4:12–4:22.) According to Officers Klimkiewicz and Kosmaty, the briefcase contained

---

[2] Throughout the hearing, the parties and their witnesses refer to marijuana and cannabis interchangeably. That may be because the Controlled Substances Act refers to marijuana, and the Florida Comprehensive Drug Abuse Prevention and Control Act refers to cannabis. *Contrast* 21 U.S.C. § 812 (c)(10) (designating marijuana as a Schedule I drug), *with* Fla. Stat. § 893.03(1)(c)(7) (designating cannabis as a Schedule I drug). For the sake of consistency, the court will use the term marijuana.

approximately $1,940; the duffel bag contained methamphetamine, cocaine, fentanyl, pills, and marijuana, which were separated into distinct bags and plastic containers. (*See* Hr'g Tr. at 24, 27, 58, 97, 100–01; *see also* Gov't Ex. 10 at 2:45–8:34.)  Like the satchel and the Cadillac, the officers searched the briefcase and the duffel bag without obtaining a warrant.  (*See* Hr'g Tr. at 106.)

As to the $1,940 in the briefcase, Officer Klimkiewicz testified that the officers needed to determine to whom it belonged so that it could be returned to its rightful owner.  (*See id.* at 24–26, 65.)  Accordingly, Officer Klimkiewicz attempted to ask Defendant—who was still handcuffed in the back of a patrol car—whom the money belonged to and whether Defendant would sign a disclaimer of ownership form.  (*See id.* at 24; *see also* Gov't Ex. 5.)  Although Officer Kosmaty found the money alongside a bag containing large quantities of illicit substances, Officer Klimkiewicz did not inform Defendant that he had the right to remain silent, that anything he said could be used against him in a subsequent prosecution, or that he had the right to have an attorney be present.  (*See* Hr'g Tr. at 24, 49, 58.)  Even so, Defendant immediately invoked his right to remain silent:

> Q. James? We're going to talk about the money. Okay? Just the money.
>
> A. What money?
>
> Q. Huh?
>
> A. What money?
>
> Q. The money that we found in the car next to the drugs.

> A. I have the right to remain silent.
>
> Q. Well, I just need to find out whose money that is. Is the money yours?
>
> A. I have the right to remain silent. Anything that I say will be held against me in a court of law.
>
> Q. This is only about the money. I need to know if the money is yours or not.
>
> A. Listen. Listen. Listen. . . . I don't have any other words for you, sir.

(Gov't Ex. 5 at 1:02–1:48.)  Still, Officer Klimkiewicz pressed on, and Defendant attempted to shift the conversation to other matters, such as the reasons for the initial stop, the fear that motivated him to run, and his other objections to the arrest.  (*See id.* at 1:48–3:03.)  When it became clear that Defendant would not discuss the money or sign a disclaimer of ownership form, Officer Klimkiewicz discontinued the interview and informed Officer Kosmaty's supervisor, Sergeant Glatthorn, that Defendant had invoked his right to remain silent.  (*See* Hr'g Tr. at 59.)

A few minutes later, Sergeant Glatthorn resumed the interview where Officer Klimkiewicz had left off, and pressed Defendant to say to whom the money belonged. (*See id.*)  According to Officer Klimkiewicz, Defendant remained steadfast in his refusal to discuss the money or to sign a disclaimer of ownership form and consistently invoked his right to remain silent in response to Sergeant Glatthorn's questions.  (*See id.* at 59–60.)

At this point, Officer Klimkiewicz informed Defendant of his right to remain silent and to have an attorney present before asking Defendant whether he still wished

- 8 -

to discuss the other topics that he had attempted to raise during their earlier discussion. (*See* Gov't Ex. 6 at 1:05–2:00; *see also* Hr'g Tr. at 55–66.)  As before, Defendant wanted to discuss the reason for the initial stop.  (*See* Gov't Ex. 6 at 1:05–2:00.)  In response, Officer Klimkiewicz reiterated what he initially told Defendant: the officers initiated the stop upon observing Defendant operating the Cadillac with unilluminated headlights before unlawfully parking in a handicapped parking space without displaying a disabled parking permit.  (*See id.* at 1:05–2:24, 3:13–3:17.)  Officer Klimkiewicz then asked Defendant whether he wanted to discuss what occurred when they stepped outside, at which point Defendant reasserted his right to remain silent, and Officer Klimkiewicz terminated the interview.  (*See id.* at 3:17–3:39; *see also* Hr'g Tr. at 61.)

Ultimately, Defendant was arrested for resisting without violence, battery on law enforcement, possession of a firearm by a convicted felon, and multiple drug charges.  (*See* Hr'g Tr. at 29.)  Defendant was also issued citations for failing to display his headlights after sunset and for parking in a handicapped parking space without the necessary permit.  (*Id.* at 30.)  On August 25, 2025, a grand jury returned a one-count indictment charging Defendant with unlawfully possessing a firearm and ammunition as a felon, in violation of 18 U.S.C. § 922(g)(1).  (*See* Dkt. 1.)

## APPLICABLE STANDARDS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  Nevertheless, the Amendment does not expressly prohibit

- 9 -

evidence obtained in violation of its commands. *Herring v. United States*, 555 U.S. 135, 139 (2009); *accord Davis v. United States*, 564 U.S. 229, 236 (2011) ("[T]he [Fourth] Amendment says nothing about suppressing evidence obtained in violation of [its] command."). "To enforce the Fourth Amendment's prohibition against 'unreasonable searches and seizures,'" the Supreme Court has created the exclusionary rule, which may be applied to "exclude evidence obtained by unconstitutional police conduct." *Utah v. Strieff*, 579 U.S. 232, 234–35 (2016); *Davis*, 564 U.S. at 236 (explaining that the exclusionary rule "is a prudential doctrine, created by [the Supreme Court] to compel respect for the constitutional guaranty" (quotations omitted)).

Importantly, "[e]xclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search." *Davis*, 564 U.S. at 236. "The fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring*, 555 U.S. at 140. Rather, the purpose of the exclusionary rule is to deter future Fourth Amendment violations. *See id.* at 141. Accordingly, evidence should be excluded only when the benefits of deterrence outweigh the substantial costs associated with "letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system." *Id.*; *see Davis*, 564 U.S. at 237 ("For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.").

"The extent to which the exclusionary rule is justified by . . . deterrence . . . [therefore] varies with the culpability of the law enforcement conduct." *Herring*, 555 U.S. at 143 (quotation omitted). "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis*, 564 U.S. at 238 (quotation omitted). "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* (quotation omitted). At bottom, "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Illinois v. Krull*, 480 U.S. 340, 348–49 (1987).

"The Fifth Amendment provides that no person shall be compelled in any criminal case to be a witness against himself." *Bowen v. Sec'y, Fla. Dep't of Corr.*, 92 F.4th 1328, 1334 (11th Cir. 2024) (quotation omitted). "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). Therefore, in such situations, law enforcement officers are required to inform a suspect, "prior to any questioning[,] that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and

- 11 -

that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479.

Unlike the Fourth Amendment, which does not expressly prohibit evidence obtained in violation of its commands, "[t]he Fifth Amendment . . . is by its own terms an exclusionary rule of a very broad scope." *See United States v. Hampton*, 775 F.2d 1479, 1486 n.35 (11th Cir. 1985). Accordingly, the government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards" described above. *Miranda*, 384 U.S. at 444; *accord Bowen*, 92 F.4th at 1334 (explaining that, in service of a defendant's privilege against self-incrimination, "the government may not use statements offered while [the defendant] was in 'custodial interrogation' unless that [defendant] was informed of his rights").

## ANALYSIS

Defendant moves to suppress evidence related to the loaded firearm found within his satchel, the narcotics recovered from the Cadillac, and the statements that he made to officers following his arrest. (*See* Dkt. 47.) His motion advances five principal arguments. (*See id.* at 14–19.) First, Defendant argues that Officers Klimkiewicz and Shaouni violated his Fourth Amendment right to be free from searches and seizures "when they 'seized' him inside the 7-Eleven without probable cause or reasonable suspicion." (*Id.* at 15, 16–19.) Second, Defendant asserts that Officers Klimkiewicz and Shaouni further violated his Fourth Amendment right to be free from searches and seizures when they threw him to the ground and handcuffed

him for exercising his right to "walk away from the unlawful encounter." (*Id.* at 15, 17.) Third, Defendant contends that Officer Shaouni violated his Fourth Amendment right to be free from searches and seizures by searching the satchel without a warrant. (*Id.* at 15, 17–18.) Fourth, Defendant argues that the officers collectively violated his Fourth Amendment right to be free from searches and seizures by searching the Cadillac without a warrant. (*Id.*) Fifth, Defendant argues that the officers violated his Fifth Amendment right against self-incrimination when they subjected him to a series of custodial interrogations, despite his repeatedly invoking his right to remain silent. (*Id.* at 15, 18–19.) The court addresses each argument in turn.

### A. Fourth Amendment Seizure

As discussed, the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991).

Arrests are seizures within the meaning of the Fourth Amendment. *See District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018). "The constitutional validity of a warrantless arrest depends upon whether, at the time of the arrest, the officer had probable cause to make the arrest." *United States v. Rodriguez*, 198 F. App'x 842, 844 (11th Cir. 2006). "A custodial arrest of a suspect based on probable cause is a

- 13 -

reasonable intrusion under the Fourth Amendment." *Virginia v. Moore*, 553 U.S. 164, 177 (2008). "A warrantless arrest without probable cause violates the Fourth Amendment." *United States v. Gardner*, 444 F. App'x 361, 364 (11th Cir. 2011).

"Probable cause exists when an arrest is objectively reasonable based on the totality of the circumstances." *Barnett v. MacArthur*, 956 F.3d 1291, 1296–97 (11th Cir. 2020) (quotation omitted). This standard is met "when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Boyd*, 388 F. App'x 943, 947 (11th Cir. 2010) (quotation omitted). Ultimately, probable cause is a low bar. *See Wesby*, 583 U.S. at 57 ("Probable cause is not a high bar." (quotation omitted)). Indeed, "[i]t requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Barnett*, 956 F.3d at 1297.

Traffic stops and investigative detentions, also known as *Terry*[3] stops, are limited seizures that must also comply with the Fourth Amendment. *See Heien v. North Carolina*, 574 U.S. 54, 60 (2014) ("A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment."); *Moore v. Pederson*, 806 F.3d 1036, 1044 (11th Cir. 2015) ("A *Terry* stop is a type of seizure under the Fourth Amendment because it restrains the freedom of the detainee to walk away or otherwise remove himself from

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

the situation."). Whether an encounter is characterized as a traffic stop or an investigatory *Terry* stop, the analytical framework is generally the same. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (explaining that "a routine traffic stop is more analogous to a so-called *Terry* stop than to a formal arrest." (alterations adopted and quotation omitted)). Indeed, a police officer may lawfully detain an individual during a traffic stop or a *Terry* stop if they have reasonable suspicion to believe that criminal activity has occurred or will occur. *See Heien*, 574 U.S. at 60 (explaining that, to justify a seizure during a traffic stop, "officers need only [have] reasonable suspicion—that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law."); *United States v. Campbell*, 26 F.4th 860, 880 (11th Cir. 2022) ("[T]o comply with the Fourth Amendment, an officer [performing a traffic stop] must have reasonable suspicion" that the person to be stopped has committed criminal activity. . . . Even minor traffic violations qualify as criminal activity."); *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) ("[L]aw enforcement officers may seize a suspect for a brief, investigatory *Terry* stop where . . . [they] have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity."). In this way, traffic stops and *Terry* stops are distinguishable from "detentions that amount[] to an arrest," *United States v. Acosta*, 363 F.3d 1141, 1145–46 (11th Cir. 2004), which must be supported by probable cause, *Case*, 555 F.3d at 1326 n.10.

"Reasonable suspicion is a less demanding standard than probable cause, but the Fourth Amendment requires [some] objective justification for police to make an investigatory stop." *United States v. Turner*, 684 F. App'x 816, 820 (11th Cir. 2017); *accord Jordan*, 635 F.3d at 1186 ("[R]easonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence."). While "an inchoate and unparticularized suspicion or hunch of criminal activity is not [sufficient] to satisfy the minimum level of objectivity required," an officer will have reasonable suspicion to perform an investigatory stop if there is "a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." *United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005) (quotation omitted). Accordingly, an officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 1311 (quotation omitted); *see Heien*, 574 U.S. at 61 ("Reasonable suspicion [in this context,] arises from the combination of an officer's understanding of the facts and his understanding of the relevant law."); *United States v. Packer*, 375 F. App'x 976, 978 (11th Cir. 2010) ("Reasonable, articulable suspicion must be drawn from specific facts, and rational inferences therefrom, measured under the totality of the circumstances and in light of the officer's knowledge."). "When determining whether reasonable suspicion exists, a court must examine the totality of the circumstances to ascertain whether the officer had a particularized and objective basis for suspecting legal wrongdoing." *Turner*, 684 F. App'x at 820 (quotation omitted).

### 1. Defendant's Initial Detention

Defendant argues that Officers Klimkiewicz and Shaouni "violated his Fourth Amendment rights when they approached him inside the 7-Eleven . . ., advised him he was not free to leave, and commanded him to exit the store with the officers." (Dkt. 47 at 15–16.) Specifically, Defendant argues that the officers lacked probable cause or reasonable suspicion to justify his seizure, as they "were not responding to a reported crime" and did not see him commit an offense. (*See id.* at 16–17.) In response, the government contends that Officers Klimkiewicz and Shaouni had reasonable suspicion to perform an investigatory stop because they observed Defendant commit two traffic violations. (*See* Dkt. 54 at 6–7.) Indeed, the government asserts that the officers had sufficient probable cause to arrest Defendant, as Florida law permits law enforcement officers to perform warrantless arrests of persons whom they observe unlawfully parking in a handicapped parking space. (*See id.* (citing Fla. Stat. §§ 316.1955(1), 901.15 (5)).

At the hearing, Defendant argued that his initial detention was not a traffic stop, but a *Terry* stop. (*See* Hr'g Tr. at 36, 124.) Notwithstanding the characterization, reasonable suspicion that criminal activity has occurred is all that is required to justify the investigatory stop. *See Jordan*, 635 F.3d at 1186; *Baxter v. Roberts*, 54 F.4th 1241, 1256 n.9 (11th Cir. 2022) ("We have sometimes indicated that probable cause, rather than reasonable suspicion, is necessary to justify a traffic stop in which the reason for the stop is a potential traffic violation rather than suspicion of other criminal activity.

But in our recent en banc opinion in [*Campbell*], we clarified that reasonable suspicion is all that is required to justify any type of traffic stop." (quotations omitted)).

Even so, applying the Eleventh Circuit's reasoning from *United States v. Gibbs*, the court concludes that Defendant's initial detention was the product of a traffic stop. *See* 917 F.3d 1289 (11th Cir. 2019), *abrogated on other grounds by Campbell*, 26 F.4th at 880. In that case, officers watched as a man parked his vehicle facing oncoming traffic. *See id.* at 1292. Having observed this traffic violation, the officers initiated an investigatory stop. *See id.* As the officers approached, the driver was standing beside the vehicle, talking to the defendant. *See id.* Upon seeing the officers, the defendant informed them that he was carrying an unlicensed firearm. *See id.* Accordingly, the officers arrested the defendant, who was later indicted for unlawfully possessing the firearm. *See id.* at 1292–93. Before trial, the defendant moved to suppress the firearm and the statements that he made to the officers during the encounter, asserting, among other things, that they had lacked reasonable suspicion to detain him. *See id.* at 1293. In considering the motion, the district court analyzed the encounter as a *Terry* stop. *See id.* at 1296. On appeal, the Eleventh Circuit concluded that the stop was more accurately described as an investigatory stop arising from a lawful traffic stop. *Id.* In reaching this conclusion, the court acknowledged that the case before it differed from the typical traffic stop, which generally "arises when a law enforcement officer stops a vehicle [that is] traveling on the roadways [and] pulls the car over." *See id.* But the court reasoned that the encounter "had the essential trappings of a traffic stop" because

- 18 -

the officers initiated the stop to cite the driver for a traffic violation, which they witnessed and which remained ongoing.  *Id.*  Although the driver was no longer in the vehicle, the court emphasized that he had only just exited and was still "within arm's reach" of it when the officers approached.  *See id.*

As in *Gibbs*, Defendant's initial detention had the essential trappings of a traffic stop.  At the hearing, Officers Klimkiewicz and Shaouni testified that they observed Defendant operating the Cadillac with unilluminated headlights before unlawfully parking in a handicapped parking space without displaying a disabled parking permit, in violation of Florida law.  (*See* Hr'g Tr. at 5–6, 9, 63, 68–69.)  *See* Fla. Stat. § 316.217(1)(a) (requiring "[e]very vehicle operated upon a highway within this state shall display lighted lamps and illuminating devices . . . [a]t any time from sunset to sunrise including the twilight hours"); Fla. Stat. § 316.1955(1) (prohibiting vehicles from parking in a handicapped parking spaces unless the vehicle displays a disabled parking permit and is indeed transporting the person to whom the permit is issued).  Accordingly, Officers Klimkiewicz and Shaouni initiated an investigatory stop to address the traffic violations.  (*See* Hr'g Tr. at 5–6, 69.)  As in *Gibbs*, Defendant had only just exited the vehicle, and one of the traffic violations remained ongoing as the officers initiated the stop.  (*See* Gov't Ex. 4 at 0:54–3:59; Gov't Ex. 8; Gov't Ex. 9 at 0:56–3:59; Gov't Ex. 10; Gov't Ex. 11.)  Because Defendant's initial detention had the essential trappings of a traffic stop, the court analyzes it as such.

A traffic stop is constitutional if it is based on an officer's reasonable suspicion that the defendant has committed a traffic violation.  *See Heien*, 574 U.S. at 60;

*Campbell*, 26 F.4th at 880 n.15; *Baxter*, 54 F.4th at 1256 n.9.  Before the Eleventh Circuit "clarified that 'reasonable suspicion is all that is required' to justify any type of traffic stop," *Baxter*, 54 F.4th at 1256 n.9 (quoting *Campbell*, 26 F.4th at 880 n.15), it routinely held that law enforcement had sufficient probable cause to initiate a traffic stop when they personally observed a traffic infraction, *see Harris*, 526 F.3d at 1338 (concluding that an officer had probable cause to perform a traffic stop "because he observed the [driver] commit a traffic violation"); *United States v. Steed*, 548 F.3d 961, 967 n.4 (11th Cir. 2008) (concluding that law enforcement officers had probable cause to initiate a traffic stop because they personally observed the alleged traffic violation); *United States v. Scott*, 693 F. App'x 835, 836 (11th Cir. 2017) (explaining that officers will have probable cause to perform a traffic stop when they "personally observe[] a traffic infraction."); *United States v. Leonard*, 356 F. App'x 231, 237 (11th Cir. 2009) ("[T]here is probable cause to conduct a traffic stop where an officer observes a defendant commit a non-criminal traffic violation[,] such as speeding or making an illegal lane change."); *United States v. Johnson*, No. 24-14083, 2026 WL 84476, at *4 (11th Cir. Jan. 12, 2026) ("Observation of a traffic violation gives an officer probable cause to conduct a traffic stop.").  Here, Officers Klimkiewicz and Shaouni testified that they personally observed Defendant commit two traffic infractions.  (*See* Hr'g Tr. at 5–6, 9, 63, 68–69.)  Accordingly, they had sufficient reasonable suspicion to initiate a traffic stop.  *See Jordan*, 635 F.3d at 1186; *Turner*, 684 F. App'x at 820.

At the hearing, Defendant argued that the court should question Officers Klimkiewicz and Shaouni's candor on this point.  (*See* Hr'g Tr. at 122–24.)  Defendant

- 20 -

contends that the traffic violations were merely a pretext for the officers to search him. (*See id.*)  Having observed Officers Klimkiewicz and Shaouni at the hearing, the court concludes that they are reliable witnesses and finds that their testimony is consistent with one another, the footage from their body-worn cameras, and the footage from the 7-Eleven's surveillance camera.  For example, footage from the 7-Eleven's surveillance camera corroborates the officers' testimony that Defendant was operating the Cadillac with unilluminated headlights before parking in a handicapped parking space.  (*See* Gov't Ex. 1; Gov't Ex. 2.)  Further, footage from the officers' body-worn cameras shows Officer Klimkiewicz consistently informing Defendant that the officers initiated the stop upon observing Defendant operating the Cadillac with unilluminated headlights before unlawfully parking in a handicapped parking space without displaying a disabled parking permit.  (*See* Gov't Ex. 4 at 1:00–1:40; Gov't Ex. 6 at 1:50–3:17; Gov't Ex. 9 at 1:00–1:22.)  Footage from Officer Klimkiewicz's body-worn camera shows that he attempted to inform Defendant that the Cadillac was unlawfully parked before Defendant entered the 7-Eleven.  (*See* Gov't Ex. 4 at 0:56–1:00; Gov't Ex. 9 at 0:40–0:44.)  Indeed, the footage from Officer Klimkiewicz and Officer Kosmaty's body-worn cameras shows that the disabled parking permit was not properly displayed but was instead lying on the dashboard.  (*See* Gov't Ex. 8 at 0:00–0:57; Gov't Ex. 10 at 0:00–6:13.)  Finally, to the extent Defendant argues that Officers Klimkiewicz and Shaouni should be disbelieved because their unmarked vehicle lacked a dashboard camera and their body-worn cameras did not capture the alleged traffic violations, the Eleventh Circuit has rejected such an argument.  *See United States*

*v. Gause*, No. 22-11685, 2023 WL 2194295, at *2 (11th Cir. Feb. 24, 2023) (finding that a law enforcement officer's testimony was "in no way contradicted by [his dashboard camera's] . . . failure to show the lane change or the car in question"). At bottom, the weight of the evidence supports Officers Klimkiewicz and Shaouni's testimony, demonstrating that they had sufficient reasonable suspicion to stop Defendant. *See Heien*, 574 U.S. at 60; *Campbell*, 26 F.4th at 880 n.15; *Baxter*, 54 F.4th at 1256 n.9; *see also Harris*, 526 F.3d at 1338; *Steed*, 548 F.3d at 967 n.4; *Scott*, 693 F. App'x at 836; *Leonard*, 356 F. App'x at 237.

In any case, Officers Klimkiewicz and Shaouni's subjective reasons for the stop, whatever they may have been, are not relevant to the court's Fourth Amendment analysis. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *United States v. Alston*, 598 F. App'x 730, 733 (11th Cir. 2015) ("[T]his Court and the Supreme Court have rejected inquiry into an officer's subjective intentions in reviewing the constitutionality of searches and seizures under the Fourth Amendment."); *United States v. Smith*, 799 F.2d 704, 708–09 (11th Cir. 1986) ("[A]n objectively reasonable stop or other seizure is not invalid solely because the officer acted out of improper motivation."); *see also Dobrin v. Fla. Dep't of Highway Safety & Motor Vehicles*, 874 So. 2d 1171, 1174 (Fla. 2004) (reaffirming that the objective test from the Supreme Court's decision in *Whren* is the appropriate test to apply in determining the reasonableness of a stop under Florida's search and seizure law (citing *Holland v. State*, 696 So. 2d 757,

760 (Fla. 1997)).  Subjective intentions do not render the stop invalid or cause the evidence obtained from the subsequent search of Defendant's bag or the Cadillac to be inadmissible under the Fourth Amendment.  *See Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001) (reversing an order that affirmed a trial court order suppressing evidence obtained during an inventory search of a vehicle, following a pretextual arrest for minor traffic violations, because "a traffic-violation arrest will not be rendered invalid by the fact that it was a mere pretext for a narcotics search" (quoting *Whren*, 517 U.S. at 813)).  What matters is that "an objective assessment of the [officers'] actions in light of the facts and circumstances confronting [them] at the time" of the stop leads the court to the inescapable conclusion that this traffic stop was reasonable.  *See Smith*, 799 F.2d at 709; *Dobrin*, 874 So. 2d at 1174; *see also Degroat v. State*, 583 So. 2d 1105, 1105 (Fla. Dist. Ct. App. 1991) ("[A] reasonable law enforcement officer with the duty or authority to enforce traffic laws of this state should, and would, stop a vehicle moving on the highway at night without lighted headlights to remind, or to warn, or to give a traffic citation.").

Next, Defendant suggests that the officers violated his Fourth Amendment rights by unduly prolonging the investigatory stop.  (*See* Dkt. 47 at 16.)  To be sure, "[e]ven if the police have reasonable suspicion to make a traffic stop, they do not have unfettered authority to detain a person indefinitely." *Campbell*, 26 F.4th at 881.  "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and [to] attend to related safety concerns." *Rodriguez*, 575 U.S. at 354.  "A seizure that is

justified solely by the interest in issuing a [traffic] ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005). While officers must act diligently, they do not impermissibly prolong a traffic stop merely by performing a routine traffic investigation. *See Campbell*, 26 F.4th at 881–82. Accordingly, officers may examine a driver's license, investigate the vehicle's registration, and await the results of a criminal history check during a routine traffic stop. *See United States v. Holt*, 777 F.3d 1234, 1256 (11th Cir. 2015); *accord Rodriguez*, 575 U.S. at 355 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically[,] such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." (alteration adopted and quotation omitted)). Again, the standard is reasonableness, and the authority for the seizure will therefore last until the "tasks tied to the traffic infraction are—or reasonably should have been—completed." *See Rodriguez*, 575 U.S. at 354.

Considering the totality of the circumstances, the court cannot say that Officers Klimkiewicz and Shaouni prolonged the stop beyond what was necessary to effectuate its purpose. Approximately forty seconds passed from the moment Officers Klimkiewicz and Shaouni first encountered Defendant until they stepped outside. (*See* Gov't Ex. 9 at 0:40–1:20; *see also* Gov't Ex. 6 at 3:18–3:51.) In that brief period, Officer Klimkiewicz tried to address the underlying traffic violations with Defendant. (*See* Gov't Ex. 4 at 0:56–1:33; Gov't Ex. 9 at 0:40–1:22.) However, upon exiting the 7-

- 24 -

Eleven, Defendant attempted to run, which led to his arrest. (*See* Gov't Ex. 4 at 1:33–3:11; Gov't Ex. 9 at 1:22–2:44; *see also* Hr'g Tr. at 15.)   In so doing, Defendant prevented Officers Klimkiewicz and Shaouni from completing the traffic stop's mission.  *See Rodriguez*, 575 U.S. at 355; *Holt*, 777 F.3d at 1256.   For instance, Defendant never produced his license, despite Officer Klimkiewicz's request.   (*See* Gov't Ex. 4 at 1:33–3:11; Gov't Ex. 9 at 1:22–2:44.)  Further, because Defendant tried to run, the officers could not investigate Defendant's proof of insurance, examine the Cadillac's registration, or research Defendant's criminal history until after his arrest. (*See* Hr'g Tr. at 17, 47, 73–74; *see also* Gov't Ex. 4 at 1:33–3:11; Gov't Ex. 9 at 1:22–2:44.)  Simply put, Officers Klimkiewicz and Shaouni did not unduly prolong the stop in violation of the Fourth Amendment, as Defendant denied them the opportunity to complete its mission by unlawfully attempting to run from a lawful traffic stop.  In any case, the Eleventh Circuit has upheld traffic stops that were much longer than the approximately two minutes that elapsed from the moment Officers Klimkiewicz and Shaouni first encountered Defendant until his arrest. (*See* Hr'g Tr. at 15; *see also* Gov't Ex. 4 at 1:33–3:11; Gov't Ex. 6 at 1:22–2:44.)  *See Holt*, 777 F.3d at 1256 (explaining that the reasonableness of a traffic stop's duration is measured under the totality of the circumstances, and not simply by the duration of the stop, and that as a result, the court has approved traffic stops lasting for nearly 15 minutes).  Accordingly, the court finds that Officers Klimkiewicz and Shaouni did not violate Defendant's Fourth Amendment rights by prolonging the traffic stop.

Finally, Defendant argues that the officers violated his Fourth Amendment rights when they arrested him as he attempted to "walk away from the unconstitutional encounter." (*See* Dkt. 47 at 17.) "[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *see United States v. Mendenhall*, 446 U.S. 544, 553 (1980) ("Police officers enjoy the liberty ( . . . possessed by every citizen) to address questions to other persons, although ordinarily the person addressed has an equal right to ignore his interrogator and walk away." (quotations omitted)). That said, a person detained during a traffic stop is not free to leave. *See Berkemer v. McCarty*, 468 U.S. 420, 437 (1984); *Acosta*, 363 F.3d at 1149 ("A reasonable person knows that he is not free to drive away from a traffic stop until it is completed, just as a reasonable person knows that he is not free to walk away from a *Terry* stop until it is over."); *Johnson*, 2026 WL 84476, at *6 ("A reasonable person knows he cannot terminate and leave a traffic stop initiated by a law enforcement officer."). Defendant was not free to leave once Officers Klimkiewicz and Shaouni initiated the traffic stop; he was detained. (*See* Hr'g Tr. at 5–6, 9, 43, 63, 68–69.) *See Heien*, 574 U.S. at 60; *Campbell*, 26 F.4th at 880 n.15; *Baxter*, 54 F.4th at 1256 n.9; *see also Harris*, 526 F.3d at 1338; *Steed*, 548 F.3d at 967 n.4; *Scott*, 693 F. App'x at 836; *Leonard*, 356 F. App'x at 237. Accordingly, Defendant did not have a constitutional right to walk away from the officers once they initiated the investigatory stop, nor was he free to run away as they attempted to perform their

- 26 -

mission.  Here, the footage from Officers Klimkiewicz and Shaouni's body-worn cameras shows Defendant flee a lawful traffic stop and subsequently resist the officers' attempts to subdue him.  (*See* Gov't Ex. 4 at 1:47–3:11; Gov't Ex. 9 at 1:25–2:25.)  As a result, the officers did not violate Defendant's Fourth Amendment rights when they arrested Defendant, as they had probable cause to believe that he was resisting an officer without violence.  *See United States v. Lester*, 477 F. App'x 697, 701 (11th Cir. 2012) ("Under Florida law, when a defendant resists detention during [an investigatory] stop by struggling with the officer, the officer is justified in arresting the defendant for resisting an officer without violence."); *C.E.L. v. State*, 24 So. 3d 1181, 1186 (Fla. 2009) (observing that while "flight, standing alone, is insufficient to form the basis of a resisting without violence charge," a person resists without violence if they "know of the officer's intent to detain him, and the officer . . . [is] justified in making the stop at the point when the command to stop is issued"); *see also* Fla. Stat. § 843.02 ("Whoever shall resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree.").  Thus, neither Defendant's initial detention nor his arrest violated the Fourth Amendment.

### B. Fourth Amendment Search

As discussed, the Fourth Amendment protects the right of the people to be secure from unreasonable searches.  *See* U.S. Const. amend. IV.  This fundamental right "is generally preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer upon a showing of probable cause."

*United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006). "Generally, warrantless searches are per se unreasonable under the Fourth Amendment, but there are certain exceptions." *United States v. Collins*, 699 F. App'x 904, 905 (11th Cir. 2017); *accord Tamari*, 454 F.3d at 1261 ("There are, of course, exceptions to the general rule that a warrant must be secured before a search is undertaken.").

### 1. The Satchel

Defendant argues that the court should suppress the satchel and its contents for three reasons. (*See* Dkt. 47 at 17–18.) First, Defendant contends that the satchel and its contents are subject to suppression under the "forced abandonment" doctrine, as Defendant abandoned the satchel "as a direct result of police misconduct during an illegal seizure." (*See id.* at 17.) Second, Defendant argues that the warrantless search of his satchel was unreasonable, as there was no reason to believe that it contained evidence of a crime. (*See id.* at 18.) Third, Defendant asserts that the search does not fall within the exception for searches incident to a lawful arrest, as "the bag was not on [his] person or within his grabbable area when it was searched." (*See id.*) In response, the government argues that, among other things, Defendant voluntarily abandoned the satchel, and thus lacks standing to challenge Officer Shaouni's search. (*See* Dkt. 54 at 8.)

"Ordinarily, an individual maintains a reasonable expectation of privacy in his personal property that is protected by the Fourth Amendment." *United States v. Johnson*, 811 F. App'x 564, 569 (11th Cir. 2020); *see United States v. Ross*, 963 F.3d 1056,

1062 (11th Cir. 2020) (explaining that the Fourth Amendment's protections against unreasonable searches "extend[s] to any thing or place with respect to which a person has a reasonable expectation of privacy"). Nevertheless, "an individual's Fourth Amendment rights are not infringed—or even implicated—by a search of a thing or place in which he has no reasonable expectation of privacy." *Ross*, 963 F.3d at 1062; *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000) ("Fourth Amendment rights . . . are personal, and only individuals who actually enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search."). "[A] person loses his Fourth Amendment interest in an item of property if he abandons it." *United States v. Morgan*, 143 F.4th 1264, 1272 (11th Cir. 2025); *see United States v. Brown*, No. 20-14750, 2021 WL 4955823, at *2 (11th Cir. Oct. 26, 2021) ("Individuals do not have a Fourth Amendment interest in items in which they lack a reasonable expectation of privacy, like, for example, abandoned property."). In the motion to suppress context, the court's analysis focuses on "whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *United States v. Falsey*, 566 F. App'x 864, 867 (11th Cir. 2014) (quotation omitted). This is an "objective, common-sense" analysis, *Morgan*, 143 F.4th at 1272, and it is Defendant's burden to show that he has a legitimate expectation of privacy in the thing to be searched, *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008).

As discussed, Officer Klimkiewicz testified that Defendant threw the satchel

- 29 -

into the parking lot as he resisted arrest. (*See* Hr'g Tr. at 16–18, 48–49.) A detailed review of the footage from Officer Klimkiewicz's body-worn camera shows the satchel clearly in Defendant's hand, with a clear separation between the satchel and the officers' hands. (*See* Gov't Ex. 4 at 1:48–1:53.) Just before the officers subdue Defendant, the footage also shows Defendant swing his arm forward, launching the satchel into the parking lot. (*See id.* at 1:48–1:54; *see also* Hr'g Tr. at 14–16, 48–49, 81.) Applying common sense to the testimony and evidence produced during the hearing, the court concludes that Defendant unlawfully attempted to flee a lawful traffic stop, and, when it became clear that he would not escape, attempted to disassociate himself from the satchel and firearm. (*See* Gov't Ex. 4 at 1:40–3:11; Gov't Ex. 9 at 1:22–2:22.) *See Morgan*, 143 F.4th at 1272 (determining whether a defendant has abandoned their interest in something for Fourth Amendment purposes is an "objective, common-sense" analysis). Defendant therefore lacks standing to challenge Officer Shaouni's search of the satchel. *See Morgan*, 143 F.4th at 1272 ("[A] person loses his Fourth Amendment interest in an item of property if he abandons it."); *Ross*, 963 F.3d at 1066 ("[A] party's abandonment of a place or thing runs to the merits of his Fourth Amendment challenge."); *see also Hodari D.*, 499 U.S. at 623 (concluding that the trial court properly denied a motion to suppress evidence concerning contraband that the defendant intentionally "tossed away" while running from the police, as it "was not the fruit of a seizure"); *United States v. Merricks*, 572 F. App'x 753, 758 (11th Cir. 2014) (concluding that a defendant "lack[ed] standing to challenge the seizure of [a] firearm"

- 30 -

that he "voluntarily abandoned . . . while being pursued by law enforcement"); *United States v. Tinoco*, 304 F.3d 1088, 1095, 1117 (11th Cir. 2002) (concluding that the district court did not err in denying a motion to suppress evidence concerning contraband that the defendants threw overboard when attempting to evade the United States Coast Guard, as the defendants "effectively abandoned the contraband and thus ha[d] no Fourth Amendment standing to challenge the seizure"); *United States v. Rahmings*, No. 23-12931, 2024 WL 3594456, at *2 (11th Cir. July 31, 2024) ("By voluntarily ridding himself of the backpack to distance himself from incriminating evidence, [the defendant] showed an intent to voluntarily relinquish or discard any interest in the property."); *United States v. Marion*, No. 8:19-CR-555-TPB-JSS, 2021 WL 4200931, at *3 (M.D. Fla. Aug. 13, 2021) (concluding that a defendant abandoned his interest in the contents of a shopping bag, which he tossed "approximately eight feet away after the officers announced their presence," as the defendant's conduct "demonstrate[d] an attempt to distance himself from the shopping bag").

Still, Defendant contends that he only did so "as a direct result of [the officers'] misconduct during an illegal seizure." (Dkt. 47 at 17.) This argument fails, as Officers Klimkiewicz and Shaouni had reasonable suspicion to initiate the traffic stop and, once Defendant unlawfully attempted to run from a lawful traffic stop, the officers had probable cause to arrest Defendant for resisting an officer without violence. *See Berkemer*, 468 U.S. at 437; *Campbell*, 26 F.4th at 880 n.15; *Lester*, 477 F. App'x at 701. (*See* Hr'g Tr. at 5–6, 9, 43, 63, 68–69.) As a result, the Fourth Amendment's

Exclusionary Rule is not implicated here. *See Strieff*, 579 U.S. at 234–35; *Davis*, 564 U.S. at 237; *Herring*, 555 U.S. at 141; *Krull*, 480 U.S. at 348–49; *United States v. Williams*, No. 22-10426, 2023 WL 2785223, at *1 (11th Cir. Apr. 5, 2023) (affirming the denial of a motion to suppress because officers were justified in performing a search incident to a lawful arrest for resisting without violence after the defendant attempted to flee a lawful traffic stop). As the traffic stop was lawful, the "forced abandonment doctrine" that Defendant cites is inapplicable. *Compare Strieff*, 579 U.S. at 237 ("[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree."), *and Herring*, 555 U.S. at 144 ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. . . . [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."), *with United States v. Beck*, 602 F.2d 726, 729–30 (5th Cir. 1979) ("While it is true that a criminal defendant's voluntary abandonment of evidence can remove the taint of an illegal stop or arrest, it is equally true that for this to occur the abandonment must be truly voluntary *and not merely the product of police misconduct*." (emphasis added)), *and United States v. Coggins*, 986 F.2d 651, 653 (3d Cir. 1993) ("[W]hen the abandonment of property is *precipitated by an unlawful seizure*, that property also must be excluded." (emphasis added))

- 32 -

A detailed review of the Fifth Circuit's decision in *Beck* reinforces the court's conclusion. In that case, officers initiated a traffic stop solely because they did not recognize the defendant, who was lawfully parked with his vehicle's engine running. *See* 602 F.2d at 729. The defendant was "not offending any traffic ordinance"; there was "no evidence of recent crimes in the neighborhood, no reason to suspect that [the defendant] or his passenger were wanted by the police, and no other reason to believe that anything unusual was taking place." *See id.* The officers merely believed "that something might be afoot." *Id.* As the officers initiated the stop, they saw "a cigarette come out of the [vehicle] driver's window." *Id.* at 727. Based on this observation, officers ordered the defendant to step out, at which point they noticed a small plastic bag containing a syringe and what appeared to be marijuana. *Id.* For this, the officers arrested the defendant and searched the vehicle. *Id.* at 727–28. During the search, the officers uncovered stolen packages, leading to the defendant's indictment for possessing stolen mail. *See id.* Before trial, the defendant moved to suppress evidence obtained from his vehicle, alleging that the officers violated his Fourth Amendment rights. *Id.* at 728. The trial court denied the defendant's motion to suppress, concluding that the defendant abandoned the cigarette and plastic bag containing marijuana, which gave the officers probable cause to arrest him and search his vehicle. *See id.* The Fifth Circuit reversed. *Id.* at 730. In reaching its decision, the court emphasized that the stop was unlawful at its inception because the officers lacked any suspicion—let alone reasonable suspicion—to justify an investigatory stop. *See id.* at

- 33 -

729. Accordingly, the court held that the defendant did not voluntarily abandon the cigarette or the plastic bag because "there was a nexus between lawless [police] conduct and the discovery of the challenged evidence." *Id.* at 730 (quotation omitted). This case is readily distinguishable from *Beck*. Here, Defendant's initial detention was grounded in the officers' reasonable suspicion that Defendant had committed two traffic violations; it did not stem from the officers' unparticularized hunch that something might be afoot. *See id.* at 729. Further, unlike *Beck*, the record does not reflect any lawless conduct by Officers Klimkiewicz or Shaouni. Accordingly, the court denies Defendant's motion to suppress the satchel, the loaded firearm that was recovered therein, and the DNA evidence recovered from the firearm.

### 2. The Cadillac

Defendant argues that the court should suppress the evidence found within the Cadillac because the officers lacked probable cause to search the vehicle. (*See* Dkt. 47 at 17–18.) Warrantless searches are ordinarily unreasonable under the Fourth Amendment, unless an exception to the warrant requirement applies. *See Collins*, 699 F. App'x at 905; *Tamari*, 454 F.3d at 1261. To justify the warrantless search of the Cadillac, the government cites the automobile exception to the warrant requirement. (*See* Dkt. 54 at 8–11.)

Under the automobile exception to the Fourth Amendment's warrant requirement, law enforcement may search a vehicle if "(1) the vehicle is readily mobile[] and (2) the police have probable cause for the search." *United States v. Johnson*,

445 F. App'x 311, 313 (11th Cir. 2011) (quoting *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007)); *see California v. Carney*, 471 U.S. 386, 392–93 (1985) ("When a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes—temporary or otherwise—the two justifications for the vehicle exception come into play."). "The mobility requirement is satisfied by a showing that the automobile is operational." *Johnson*, 445 F. App'x at 313. A vehicle is operational if it "reasonably appear[s] to be capable of functioning." *Lindsey*, 482 F.3d at 1293 n.6; *see Carney*, 471 U.S. at 393 ("[T]he vehicle is obviously readily mobile by the turn of an ignition key, if not actually moving."); *United States v. Morley*, 99 F.4th 1328, 1337 (11th Cir. 2024) (holding that a district court did not abuse its discretion in finding that the automobile exception applied to the warrantless search of a vehicle that the defendant drove to the scene of a drug deal, despite the fact that the defendant had exited the vehicle and crossed the street at the time of the search, as "all automobiles that reasonably appear to be capable of functioning" are readily mobile); *United States v. Dixon*, 901 F.3d 1322, 1339 (11th Cir. 2018) ("There is no doubt that the vehicle was operational, because [the defendant's girlfriend] was driving it—albeit on the wrong side of the road—before the stop."). "[P]robable cause exists when an officer observes contraband in plain view inside the vehicle." *United States v. West*, 806 F. App'x 892, 897 (11th Cir. 2020) (citing *United States v. Spoerke*, 568 F.3d 1236, 1249 (11th Cir. 2009)); *United States v. Thomas*, 817 F. App'x 902, 905 (11th Cir. 2020) (explaining that law enforcement officers "ha[ve] probable cause to search a vehicle when [they] see[] contraband in the vehicle

in plain view.").

At the hearing, Defendant seemed to contend that the vehicle was not readily mobile at the time of the search, as law enforcement held the keys, and Officers Klimkiewicz and Kosmaty testified that they would not have allowed anyone to move it. (*See* Hr'g Tr. at 53, 103.) Nonetheless, the vehicle was operational as Defendant was driving it just before the investigatory stop. *See Dixon*, 901 F.3d at 1339; *United States v. Tamari*, 454 F.3d 1259, 1264 (11th Cir. 2006) (observing that a parked vehicle was operational for purposes of the automobile exception to the warrant requirement, despite the defendant having exited the vehicle); *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003) (explaining that the "readily mobile" requirement for the automobile exception "is satisfied by the 'ready mobility' inherent in all automobiles that reasonably appear to be capable of functioning"); *Alston*, 598 F. App'x at 734 ("The fact that [the defendant] drove the [vehicle] to the drug deal shows that it was operational."); *see also United States v. Fields*, 456 F.3d 519, 523–24 (5th Cir. 2006) (concluding that the automobile exception to the warrant requirement applied to the search of a vehicle that the defendant crashed and fled, as the vehicle had been "readily mobile . . . throughout the police chase and in all the events leading up to [the defendant's] arrest and the [vehicle's] search"); (*See id.* at 5–6, 9, 11, 68, 69; *see also* Gov't Ex. 2.) Nor does it matter that law enforcement held the keys and would not have allowed anyone to move the vehicle, as "the justification to conduct . . . a warrantless search does not vanish once the car has been immobilized. A vehicle lawfully in police custody may be searched on the basis of probable cause to believe

- 36 -

that it contains contraband, and there is no requirement of exigent circumstances to justify a warrantless search." *Lindsey*, 482 F.3d at 1293 n.7 (quoting *United States v. Johns*, 469 U.S. 478, 484 (1985)).

As to their probable cause for the search, Officers Klimkiewicz and Kosmaty testified that they searched the vehicle upon observing small amounts of marijuana on the passenger floorboard. (*See* Hr'g Tr. at 21–22, 52, 96.) Officer Kosmaty further testified that he could smell burnt marijuana emanating from the vehicle. (*See id.* at 96.) "[A]n officer's credible testimony that he smelled marijuana can establish probable cause." *Dixon*, 901 F.3d at 1339 (citing *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991)); *see Johns*, 469 U.S. at 482 ("After the officers came closer and detected the distinct odor of [marijuana], they had probable cause to believe that the vehicles contained contraband."); *United States v. Stancil*, 4 F.4th 1193, 1199 (11th Cir. 2021) (concluding that law enforcement officers in Florida had sufficient probable cause to search a vehicle based on the "smell of burnt marijuana emanating from [the] vehicle"); *Merricks v. Adkiss*on, 785 F.3d 553, 560 n.3 (11th Cir. 2015) ("[T]he smell of burnt marijuana emanating from a vehicle is sufficient probable cause to search a vehicle."); *United States v. Reed*, No. 21-10257, 2021 WL 5629980, at *2 (11th Cir. Dec. 1, 2021) ("When an officer detects the odor of marijuana emanating from a vehicle, probable cause exists to support a warrantless search of the vehicle."); *but see Wright-Johnson v. State*, 405 So. 3d 501, 507 (Fla. Dist. Ct. App. 2025) (noting the split in Florida caselaw concerning whether the smell of marijuana is, itself, still enough to

justify a search of a vehicle (collecting cases)).  So too can an officer's plain-view observation of contraband.  *See United States v. Gant*, 756 F. App'x 898, 901 (11th Cir. 2018) (affirming the denial of a motion to suppress, where officers had sufficient probable cause to search a vehicle, as they could plainly see "a clear bag of what looked like crack cocaine"); *United States v. Brown*, 498 F. App'x 940, 941–42 (11th Cir. 2012) (affirming the denial of a motion to suppress because there was probable cause for officers to search the defendant's vehicle, as they "observed a bag of marijuana in plain view and smelled burnt marijuana in the vehicle").

Here, Defendant contends that Officers Klimkiewicz and Kosmaty lacked probable cause to search the Cadillac because, at the time of the search, the officers could not have known whether what they saw and smelled inside the vehicle was illicit marijuana.[4]  (*See* Dkt. 47 at 18.)  For instance, in his motion, Defendant posits that the

---

[4] Under recent changes to state law, Floridians may lawfully possess marijuana if it is either "dispensed from a medical marijuana treatment center for medical use or it is hemp, which has a Delta-9 THC concentration not exceeding 0.3 percent on a dry-weight basis."  *Williams v. State*, 421 So. 3d 809, 817 (Fla. Dist. Ct. App. 2025) (quotations omitted); *see Campbell v. State*, 407 So. 3d 558, 563 (Fla. Dist. Ct. App. 2025) (explaining that Florida law distinguishes legal hemp and illegal marijuana by their THC concentration; "[i]f the THC concentration is greater than 0.3%, the substance is illegal cannabis, but if it is less than 0.3%, the substance is legal hemp"); *see also* Fla. Stat. § 381.986 (3) (excluding the medical use of marijuana from the definition of "cannabis"); Fla. Stat.  § 581.217(2)(b) (clarifying that hemp-derived cannabinoids "are not controlled substances or adulterants if they are in compliance with" Florida law); Fla. Stat. § 893.02(3) (excluding hemp from the definition of "cannabis").  That said, marijuana remains a Schedule I drug in Florida.  *See* Fla. Stat.  § 893.03(1)(c)(7); *see also* *Wright-Johnson*, 405 So. 3d at 507 (explaining that marijuana is still classified as a controlled substance in Florida, and that "[s]imple possession, even without an intent to distribute, remains a crime constituting a felony or misdemeanor depending on whether the amount is more or less than 20 grams").  Accordingly, the possession and use of marijuana outside of the limited statutory exceptions remains unlawful.  *See Wright-Johnson*, 405 So. 3d at 506 (observing that, while the state legislature has recently legalized marijuana in specific forms and concentrations and for specific purposes, possessing or using marijuana for any reason

marijuana that the officers observed and smelled could have been medical marijuana. (*See id.*)  If so, the officers' observations provided sufficient probable cause to believe that Defendant was engaging in criminal behavior, as Defendant could not have lawfully smoked his marijuana in the Cadillac.  *See* Fla. Stat. § 381.986(1)(k)(5)(f) (explaining that medical use does not include the use of marijuana in a vehicle, "except for low-THC cannabis not in a form for smoking").  At the hearing, Defendant alternatively argued that the marijuana that the officers observed and smelled could have been legal hemp.  (*See* Hr'g Tr. at 122.)  Officers Klimkiewicz and Kosmaty acknowledged that Defendant could have lawfully possessed certain types of hemp at the time of the search and further conceded that the two substances can appear similar and produce a similar odor.  (*See id.* at 54, 106.)  Even so, Officer Klimkiewicz explained that he recognized the substance on the passenger floorboard as marijuana because of the training that he had received in general narcotics and the experience that he had obtained from "hundreds" of marijuana related investigations.  (*See id.* at 22.)  Officer Kosmaty similarly testified that he recognized the smell of marijuana coming from the vehicle because of his experience, which includes dozens of encounters with people using the drug.  (*See id.* at 96.)

Probable cause "requires only 'a probability or substantial chance of criminal

---

other than medical use, as that term is defined by Florida law, remains a crime in this state); *Baxter v. State*, 389 So. 3d 803, 811 (Fla. Dist. Ct. App. 2024) ("[N]ot all [marijuana] is legal, and that fact must be reflected in a Fourth Amendment analysis.").  Likewise, under federal statutes, possession of marijuana is illegal.  *See* 21 U.S.C. § 812 (c)(10) (designating marijuana as a Schedule I drug); 21 U.S.C. § 844(a) (providing criminal penalties for "simple possession" of marijuana).

activity, not an actual showing of such activity.'" *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). "Thus, 'innocent behavior frequently will provide the basis for a showing of probable cause.'" *Id.* (quoting *Gates*, 462 U.S. at 243 n.13)); *see Wesby*, 583 U.S. at 68 ("[I]nnocent explanations—even uncontradicted ones—do not have any automatic, probable-cause-vitiating effect."); *United States v. Clark*, 32 F.4th 1080, 1088 (11th Cir. 2022) (explaining that, in the Fourth Amendment context, "the question is not whether there is an innocent explanation for [the defendant's] behavior, but rather whether there was probable cause—that is, whether based on the facts and circumstances within the officer's knowledge, . . . a prudent person [would] believe, under the circumstances shown, that the [defendant] has committed, is committing, or is about to commit an offense"). Accordingly, the Eleventh Circuit has rejected the argument that Defendant seeks to advance here. *See United States v. Green*, No. 24-12642, 2025 WL 1911522, at *1 (11th Cir. July 11, 2025) (affirming the denial of a motion to suppress evidence recovered during the search of a vehicle "that reeked of [marijuana]" during a traffic stop, and rejecting the defendant's argument that the smell of marijuana alone was insufficient to provide probable cause for the search because it is indistinguishable from hemp, which he could lawfully possess under state law); *United States v. Wardlow*, No. 25-10341, 2025 WL 1905372, at *1 (11th Cir. July 10, 2025) (affirming the denial of a motion to suppress evidence recovered from the search of a vehicle based on the officers' purportedly detecting an "odor of marijuana" emanating from the vehicle, and rejecting the defendant's argument that the officer lacked probable cause for the

search, as he had not ruled out the possibility that the smell was caused by the defendant's possession of hemp or medical marijuana).  At bottom, even if what Officers Klimkiewicz and Kosmaty saw and smelled was hemp or medical marijuana, Defendant's "post-hoc innocent explanation for [his] incriminating behavior does not vitiate the finding of probable cause."  *United States v. Lebowitz*, 676 F.3d 1000, 1011 (11th Cir. 2012)).  Accordingly, the government has cleared the bar to show that Officers Klimkiewicz and Kosmaty had sufficient probable cause to search the Cadillac.  *See Wesby*, 583 U.S. at 57 (observing that probable cause "is not a high bar").  Because the officers had probable cause to search the Cadillac for marijuana, the automobile exception allowed them to search all areas and containers of the vehicle where marijuana might be found.  *See United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."); *United States v. Baldwin*, 774 F.3d 711, 720 (11th Cir. 2014) ("Once probable cause exists to search the vehicle, the police may search all parts of the vehicle, and any containers therein, where the object of the search might be found."); *United States v. Corley*, 408 F. App'x 245, 247 (11th Cir. 2011) ("Because the deputies smelled marijuana and found [the defendant] in possession of marijuana, the totality of the circumstances supported the warrantless search of the trunk.").

Finally, to the extent that Defendant questions Officers Klimkiewicz and Kosmaty's candor, the court finds that they are reliable witnesses.  (*See* Hr'g Tr. at 128–29.)  As mentioned, Officer Klimkiewicz's testimony throughout the hearing was

consistent with that of his fellow officers and with the video evidence presented. Relevant here, Officer Klimkiewicz conceded during the hearing that the marijuana shake that he observed is not visible on his body-worn camera as he is looking into the vehicle, but the footage from his body-worn camera shows him stooping to view the marijuana shake as soon as he opened the vehicle. (*See* Gov't Ex. 8 at 0:58–1:13; *see also* Hr'g Tr. at 52.) Immediately thereafter, Officer Klimkiewicz audibly asks another officer for a bag, so he may collect the marijuana shake, before asking several other officers for a marijuana specific NIK. (*See* Gov't Ex. 8 at 1:13–1:45.) Having observed Officer Kosmaty, the court finds that he is a reliable witness. During the hearing, Officer Kosmaty was professional, calm, and courteous. Further, critical points in Officer Kosmaty's testimony—such as his plain view of marijuana in the Cadillac—are consistent with Officer Klimkiewicz's testimony, as well as the footage from Officer Klimkiewicz's body-worn camera. To the extent Defendant argues that Officer Kosmaty should be disbelieved because his body-worn camera did not capture his initial observation of the marijuana on the passenger floorboard, the Eleventh Circuit has rejected such an argument. *See Gause*, 2023 WL 2194295, at *2. Because the Cadillac was operational and Officers Klimkiewicz and Kosmaty had probable cause to believe that it contained illicit narcotics, the officers were not required to obtain a warrant before searching the Cadillac. *See Lindsey*, 482 F.3d at 1293 n.7. Accordingly, the court denies Defendant's motion to suppress the evidence recovered during the officers' search of the vehicle.

## C. Fifth Amendment

Finally, Defendant moves to exclude his post-arrest statements, asserting that he was entitled to *Miranda* warnings when Officer Klimkiewicz and Sergeant Glatthorn interviewed him about the $1,940 that Officer Kosmaty recovered from the briefcase alongside the bag of narcotics. (Dkt. 47 at 18–19, 21.) The Fifth Amendment's Self-Incrimination Clause guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In *Miranda*, the Supreme Court announced a prophylactic rule to protect against violations of the Self-Incrimination Clause." *Morgan*, 143 F.4th at 1273 (alteration adopted and quotation omitted). In that decision, "the Court decreed that police officers conducting a custodial interrogation must inform a suspect that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *Id.* (quoting *Miranda*, 384 U.S. at 479). "Law enforcement must issue *Miranda* warnings when a subject is both in custody and under interrogation by police officers." *United States v. Lightbourn*, 357 F. App'x 259, 265 (11th Cir. 2009). If a defendant "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473–74; *United States v. Travis*, 311 F. App'x. 305, 312 (11th Cir. 2009) ("[O]nce the right to silence is invoked, [law enforcement officers] must 'scrupulously honor' it and are forbidden

from further interrogation." (citing *Jacobs v. Singletary*, 952 F.2d 1282, 1292 (11th Cir. 1992)); *United States v. Racca*, 255 F. App'x 367, 370 (11th Cir. 2007) ("Where a defendant invokes his right to remain silent, the interrogation must cease."). If law enforcement officers continue their questioning, any "[s]tatements obtained in violation of *Miranda*, whether exculpatory or inculpatory, are not admissible at trial." *United States v. Cobb*, 369 F. App'x 59, 63 (11th Cir. 2010).

The government concedes that Defendant was in custody when Officer Klimkiewicz and Sergeant Glatthorn interviewed him; still, it argues that Defendant was not entitled to *Miranda* warnings because he was not under interrogation. (*See* Dkt. 54 at 11–13.) The government raises two arguments in support of this proposition. (*See id.*) First, it notes that traffic stops are not custodial interrogations requiring *Miranda* warnings. (*See id.* at 11–12.) While an investigatory stop does not ripen into an arrest simply because an officer handcuffs a suspect or secures him in the back of a patrol car, *Acosta*, 363 F.3d at 1147, it did in this case because Officer Klimkiewicz testified that Defendant was arrested the moment that he was handcuffed, (*see* Hr'g Tr. at 15). *See United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (observing that a defendant is in custody "for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest'" (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

Second, the government argues that, even if Defendant were in custody for the

purposes of *Miranda*, the officers were not required to read Defendant his *Miranda* rights because the officers' questions did not implicate "the facts of the case," but were instead limited to addressing whether the money was subject to civil forfeiture. (*See* Dkt. 54 at 11–13.) A defendant generally encounters an "interrogation" for purposes of *Miranda* when law enforcement's words or actions are reasonably likely to elicit an incriminating response. *See Morgan*, 143 F.4th at 1273 ("Words or actions constitute interrogation when, from the standpoint of an objective officer, they are reasonably likely to elicit an incriminating response from the suspect." (quotation omitted)); *United States v. Lopez-Garcia*, 565 F.3d 1306, 1317 (11th Cir. 2009) ("Interrogation, under *Miranda* means any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The Supreme Court has defined an incriminating response as any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." (quotations omitted)). The government cites no authority suggesting that Officer Klimkiewicz and Sergeant Glatthorn's questions were anything other than express questioning or its functional equivalent. (*See* Dkt. 54.) That said, it appears that the government believes that *Miranda* warnings were not required under the routine booking question exception. (*See id.* at 11–13).

Under the routine booking exception, "[a]n officer's request for routine information for booking purposes is not an interrogation under *Miranda*, even though

- 45 -

that information turns out to be incriminating." *United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991) (quotation omitted); *see Pennsylvania v. Muniz*, 496 U.S. 582, 600–02 (1990) (holding that law enforcement officers do not interrogate a defendant within the meaning of *Miranda*, and therefore do not need to provide *Miranda* warnings, when they limit their ask routine booking questions that are reasonably related to administrative concerns); *see also Morgan*, 143 F.4th at 1274 (observing that two circuits "have applied [the routine booking] exception to police questions about a suspect's ownership of property"). Nevertheless, unless law enforcement officers obtain a waiver of the suspect's *Miranda* rights, they "may not ask questions, even during booking, that are designed to elicit incriminatory admissions." *Muniz*, 496 U.S. 582, 602 n.14; *United States v. Glen-Archila*, 677 F.2d 809, 816 n.18 (11th Cir. 1982) (emphasizing that officers may not use routine booking questions as a guise for obtaining incriminating information; "[i]f investigative questions are asked while routine information is being obtained . . . answers to such questions are inadmissible if the suspect has not been read his *Miranda* rights"). The footage from Officer Klimkiewicz's body-worn camera shows that his questions were reasonably likely to elicit an incriminating response from Defendant. (Gov't Ex. 5 at 1:02–1:48.) When Defendant asked Officer Klimkiewicz to identify the money that he wanted to discuss, Officer Klimkiewicz stated that he wanted to discuss "[t]he money that [the officers] found in the car *next to the drugs*." (*Id.* (emphasis added).) At the hearing, Officers Klimkiewicz, Shaouni, and Kosmaty testified that the $1,940's proximity to the drugs would suggest that Defendant was engaged in drug trafficking. (*See id.* at 58, 88–89,

- 46 -

107–08.) Simply put, even if Officer Klimkiewicz and Sergeant Glatthorn's questions could fall within the routine booking exception in another case, they were reasonably likely to elicit an incriminating response here, *see Muniz*, 496 U.S. 582, 602 n.14; *Glen-Archila*, 677 F.2d at 816 n.18, and thus constituted an interrogation for purposes of *Miranda*, *Morgan*, 143 F.4th at 1273; *Lopez-Garcia*, 565 F.3d at 1317.

Because Defendant was in police custody when Officer Klimkiewicz and Sergeant Glatthorn attempted to interrogate him concerning the $1,940, he was entitled to receive *Miranda* warnings. *Lightbourn*, 357 F. App'x at 265. Further, when Defendant invoked his right to remain silent, Officer Klimkiewicz and Sergeant Glatthorn were required to end the interrogation. *See Miranda*, 384 U.S. at 473–74; *Travis*, 311 F. App'x. at 312; *Racca*, 255 F. App'x at 370. They did not. Accordingly, any statements that Defendant made during the first two interrogations are not admissible at trial. *See Cobb*, 369 F. App'x at 63; *see also Morgan*, 143 F.4th at 1274 (concluding that law enforcement officers violated *Miranda* when they continued to quiz the defendant as to whether he owned the property at issue, although he invoked his right to remain silent, because they needed to know to whom it belonged in case they needed to return it). That Defendant knew his *Miranda* rights does not change this result. *See Miranda*, 384 U.S. at 468 ("The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a

- 47 -

warning being given."); *United States v. Street*, 472 F.3d 1298, 1310–11 (11th Cir. 2006) (observing that the defendant's twenty-year career in law enforcement was not relevant to the *Miranda* analysis, as the court "examines the adequacy of the warnings [that the defendant] was given as if he were a layman").

Officer Klimkiewicz read Defendant his *Miranda* rights at the outset of the third interrogation. (*See* Gov't Ex. 6.) Although Defendant had previously invoked his right to remain silent, he engaged Officer Klimkiewicz and again asked that the officer state the probable cause for his initial detention. (*See id.*) A defendant "who has received and understood the *Miranda* warnings, and has not invoked his Miranda rights, waives the right to remain silent by making an uncoerced statement to the police." *Berghuis v. Thompkins*, 560 U.S. 370, 388–89 (2010). That said, where a defendant "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473–74. While officers may resume the interrogation at some later time, momentary cessations in the interrogation are insufficient. *See Michigan v. Mosley*, 423 U.S. 96, 102–03 (1975) (explaining that the court's opinion in *Miranda* cannot be read "to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent," while also recognizing that permitting "the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned");

*United States v. Goodman*, 147 F. App'x 96, 101 (11th Cir. 2005) ("[W]here a defendant only asserts his right to remain silent, and does not invoke his right to counsel, law enforcement may resume the interrogation at some later time."). At bottom, "the admissibility of statements obtained after the person in custody has decided to remain silent depends . . . on whether his right to cut off questioning was scrupulously honored." *Mosley*, 423 U.S. at 104 (internal quotation marks omitted).

Officer Klimkiewicz abandoned his first interrogation of Defendant at approximately 12:47 AM. (*See* Gov't. Ex. 5.) Less than fifteen minutes later, Officer Klimkiewicz initiated the third interrogation. (*See* Gov't Ex. 6.) The intervening fifteen minutes did not pass in silence, as Sergeant Glatthorn interrogated Defendant in that period. (*See* Hr'g Tr. at 59–60.) So not only did the officers fail to cut off questioning when Defendant first invoked his right to remain silent, as *Miranda* required, but the rapid succession of their interrogations "frustrated the purposes of *Miranda*." *Mosley*, 423 U.S. at 102–03; *Miranda*, 384 U.S. at 473–74. Indeed, a thorough review of the evidence shows that the government cannot satisfy any of the factors that the Eleventh Circuit uses to determine whether law enforcement was justified in resuming questioning after a defendant invoked their right to remain silent. *See United States v. Gray*, 771 F. App'x 976, 979 (11th Cir. 2019) ("[W]e have identified four relevant factors [for determining when questioning may be resumed after a defendant invokes his right to remain silent]: 1) whether the initial interrogation ended immediately upon invocation of the right to remain silent[,] 2) whether a substantial amount of time elapsed before questioning resumed[,] 3) whether the suspect was

again read his rights before the second round of questioning[,] and 4) whether the second round of questioning was done by a different officer about an unrelated crime." (quotation omitted)).  Accordingly, any statements that Defendant made during the third interrogation are inadmissible at trial.

### CONCLUSION

Accordingly, Defendant's motion to suppress (Dkt. 47) is **GRANTED in part and DENIED in part**.  The motion is **GRANTED** insofar as Defendant's custodial statements, following his arrest, are inadmissible, as set forth above.  The motion is otherwise **DENIED**.

**ORDERED** in Orlando, Florida, on June 24, 2026.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record